IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LESLIE BRITTON-DILLON,        )
                             )
            Plaintiff,        )        No.  07 CV 3721
                             )
      v.                      )
                             )        Hon. Michael T. Mason
                             )
MICHAEL J. ASTRUE,            )
Commissioner of Social Security )
                             )
            Defendant.        )

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge.

Leslie Britton-Dillon[1] ("Britton-Dillon" or "claimant") filed a motion for summary judgment seeking to reverse the final decision of the Commissioner of Social Security (the "Commissioner") denying her claim for disability insurance benefits under the Social Security Act (the "Act"), 42 U.S.C. §§ 216(i) and 223.  Britton-Dillon seeks an order instructing the Commissioner to pay the claimed benefits or, alternatively, remanding this case for a new hearing, an opportunity to present additional evidence, and/or any other necessary and appropriate activity.  The Commissioner filed a cross motion for summary judgment asking this Court to uphold the decision of the Administrative Law Judge ("ALJ").  This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g).  For the reasons set forth below, Britton-Dillon's motion for summary judgment

---

[1] The record contains a discrepancy in the spelling of claimant's name.  The Social Security Administration identifies claimant as Brittain-Dillon.  However, claimant commenced this action as Britton-Dillon.

is granted in part and denied in part and the Commissioner's motion for summary judgment is denied.

## I.    BACKGROUND

### A.    Procedural History

Claimant filed her application for benefits on September 12, 2003, alleging an onset date of July 12, 2002.  (R. 68-70).  Her application was denied initially on December 2, 2003 and again upon reconsideration on July 14, 2004.  (R. 22-25, 28-31).  Claimant filed a timely request for a hearing, which was held before  ALJ Paul R. Armstrong ("ALJ Armstrong") on November 23, 2005.  (R. 32, 608-40).  ALJ Armstrong issued a written decision denying claimant's request for benefits on January 5, 2006.  (R. 8-19).  The Appeals Council denied claimant's request for review on May 18, 2007, and ALJ Armstrong's decision became the final decision of the Commissioner.  (R. 4-5A). *Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001).  Britton-Dillon subsequently filed this action in the District Court.

### B.    Medical Evidence

Claimant submitted various medical records in support of her claim for benefits.  (R. 116-605).  Those records include claimant's July 13, 2002 visit to the Riverside Medical Center ("Riverside") Emergency Room ("ER").  (R. 347-52).  At that time, claimant reported soreness in her lower back along with right hip and leg pain due to a recent injury.  (R. 349).  Dr. Gregory T. Trapp ("Dr. Trapp") treated claimant with a Toradol injection and prescribed Vicodin and Flexeril.  (R. 347).  Dr. Trapp issued a work status report indicating that claimant should remain off work for "today only."  (R.

352).

Claimant returned to Riverside on July 16, 2002, and reported increased pain in her lower back and "sciatica type" pain in her right leg. (R. 166-68A). Dr. Nicholas M. Slimack ("Dr. Slimack"), a radiologist, reviewed an x-ray of claimant's lumbar spine taken on that date. (R. 354). He found "mild anterior wedging of the L2 vertebral body," which he opined "may represent a very mild compression fracture, but of undetermined age." (*Id.*). Dr. Slimack also observed "mild degenerative changes of the vertebral bodies and facet joints." (*Id.*). On July 23, 2002, claimant underwent a Computed Axial Tomography ("CT") lumbar scan. (R. 400). According to Dr. Slimack, the CT revealed that Britton-Dillon's "L2 vertebral body appears to be intact without definite fracture lines identified." (*Id.*). Dr. Slimack opined that claimant suffered from "mild compression of L2 but no impingement upon the spinal canal." (*Id.*).

The record indicates that claimant received physical therapy ("PT") from July 22, 2002 to September 30, 2002 at Riverside Outpatient Rehabilitation Services ("Riverside ORS"). (R. 357-90). During the initial evaluation, Karen J. Grube ("PT Grube"), a physical therapist at Riverside ORS, observed that claimant had a "symmetrical gait pattern with decreased trunk rotation and arm swing" and "was unable to sit for any length of time during the examination." (R. 359). Claimant reported "pain along with occasional numbness in the low back, buttock, down her legs and hands," dating back to her July 13, 2002 work injury. (*Id.*). She also stated that she was "loopy from all the medication," and that her pain was "4-5/10." (*Id.*). PG Grube observed "palpable muscle spasms" in claimant's paraspinal musculature from L5 to C6/C7. (R. 360). She treated claimant with a hot pack and gentle massage. (*Id.*). At the end of her initial

session, claimant reported her "pain scale to be 1/10." (*Id.*).

On July 24, 2002, claimant told PT Grube that her "back started feeling better" after the prior treatment and she was able to sleep on her stomach without pain. (R. 361). Britton-Dillon also reported that her pain was 3/10 and she was "less tight" across her shoulders. (*Id.*). PT Grube opined that claimant "is responding quickly to PT interventions for the lumbar spine." (*Id.*). Four days later, on July 29, 2002, claimant reported that her shoulders and neck were "killing her," and that her shoulders were "at a pain scale of 6/10" and "low back is 4/10." (R. 363). During the PT session, Britton-Dillon received thirty minutes of "myofascial trigger point pressure releases followed by specific stretching to upper trap and levator scapula." (*Id.*). PT Grube stated that claimant "tolerated treatment well," and that Britton-Dillon reported that her "neck felt looser post stretches however mid thoracic area still sore." (*Id.*).

Claimant returned to PT Grube on July 31, 2002 and reported that the pain in her upper back was "4/10 and . . . low back [was] 2/10." (R. 364). PT Grube observed that claimant continued to have pain in the "lumbar and mid thoracic area which is increased with lumbar extension movements," but had "some improvement in reported pain" since the beginning of PT. (*Id.*). She recommended that claimant continue physical therapy three times a week for the next two weeks "to work toward improved spinal stability during daily activities and decreased pain in back." (*Id.).* On August 1, 2002, claimant received "myofascial trigger point releases followed by stretches to her upper trap," electrical stimulation, and a soft massage. (R. 366). Also on that date, claimant had a follow-up visit with Dr. Trapp. (R. 118). Dr. Trapp described claimant's symptoms as "pain and tightness to lower back up to shoulders and neck." (*Id.*). Claimant stated that

4

she was "feeling better" and her pain had improved with the PT sessions. (*Id.*). Dr. Trapp prescribed Norflex and Vicodin and recommended further PT sessions. (*Id.).* On August 12, 2002, claimant returned for continued physical therapy and reported that her back "was a 10/10 last Friday" and that she had tingling down her left leg. (R. 368). Claimant also stated that she was now taking Vicodin two times per day. (*Id.*).

On August 16, 2002, a radiologist at Riverside administered a Magnetic Resonance Imaging ("MRI") study of claimant's lumbar spine. (R. 402). Dr. Amjad A. Safvi ("Dr. Safvi"), a radiology consultant, reviewed the MRI and found "no spinal stenosis, herniated discs, or bulging discs." (*Id.*). The doctor opined that claimant had normal alignment, no subluxation, and "minimal narrowing of the anterior portion of the L2 vertebral body." (*Id.*).

Claimant continued to receive physical therapy throughout August 2002, rating her pain as 6/10 on August 14, and 5/10 on August 15 and 19. (R. 369-71). On August 19, 2002, PT Grube observed that claimant was "able to perform the exercises without increase pain in low back area," but "continues to have pain at night when trying to sleep and if up for any length of time." (R. 371). PT Grube opined that claimant "tolerated fairly, but her pain seemed unchanged after today's session." (*Id.*). During the August 23, 2002 PT session, Britton-Dillon reported that she "was very sore last night and felt as if she was back at the starting point again." (R. 373).

Claimant sought treatment from Dr. Donald E. Roland ("Dr. Roland"), a physician at the Riverside pain clinic, on August 26, 2002 for "complaints of pain across her lower back and also pain in the upper back region." (R. 404-06). Upon examination, Dr. Roland found Britton-Dillon had "equal motor strength in the upper extremities for

biceps, triceps, deltoid, trapezius, hand grasp, and wrist flexion and extension." (R. 405). The doctor observed that "on straight leg raising, the patient had pain across her lower back at approximately 80-90 degrees, but no pain radiating down her leg." (R. 406). Dr. Roland opined that "this is a patient with possible cervical radiculopathy" and "musculoskeletal low back pain with the only evidence being possible compression fracture on the CT scan." (*Id.*). He recommended another MRI study of claimant's cervical spine and prescribed Ultracet, Vioxx, Zanaflex in the evening and Skelaxin during the day. (*Id.*).

Claimant underwent a second MRI on August 28, 2002. (R. 411). The reviewing radiologist determined that claimant's spinal cord appeared intact, her vertebral marrow signals were "relatively uniform," and her disc spaces appeared "relatively well preserved for age." (*Id.*). The radiologist concluded that the MRI did not indicate any herniated disc or spinal stenosis. (*Id.*). According to the accompanying report, a bone scan performed on September 4, 2002 showed no significant abnormal bony activity. (R. 413). Dr. Roland reviewed the MRI and bone scan results on September 16, 2002. (R. 407). He found that, on physical examination, claimant was "essentially unchanged" and recommended that she continue her current medications and physical therapy. (*Id.*).

Claimant returned to Dr. Roland on September 26, 2002 for trigger point injections. (R. 408-09). She reported continuing pain in the trapezius area. (R. 408). Dr. Roland identified trigger points in the trapezius muscle "overlying the fourth rib along the midaxillary line on both the left and the right sides." (*Id.*). Dr. Roland noted that claimant "tolerated the procedure well," diagnosed myofascial pain syndrome, and

discharged her in "good condition." (R. 408-09). Four days later, on September 30, 2002, claimant contacted Riverside ORS and informed them that she would "no longer be coming to physical therapy because her injuries were determined not to be work related and they will no longer pay for physical therapy." (R. 390).

Britton-Dillon submitted treatment records from Dr. Estelle Fletcher ("Dr. Fletcher") covering the period between October 1, 2002 to September 23, 2003. (R. 191-267). Dr. Fletcher's records are largely illegible. These records indicate that claimant sought treatment for her lower back, vaginal bleeding, "severe pain in her buttocks," and shoulder pain. (*Id.*). They also show that Dr. Fletcher refilled claimant's prescriptions on numerous occasions. (*Id.*).

On December 3, 2002, claimant received treatment from Dr. Jeffrey W. Spychalski ("Dr. Spychalski") at Hinsdale Orthopaedic Associates. (R. 449-51). Dr. Spychalski found claimant's back range of motion unrestricted. (R. 449). He observed that Britton-Dillon could bend over and touch her toes and "did not really display any significant pain behaviors" while in his office. (*Id.*). Dr. Spychalski reviewed claimant's medical records and noted that "x-rays of her lumbar spine reveal wedging of the L2 vertebra, but it was questionable whether this truly represented an acute fracture." (R. 450). The doctor also noted that claimant's MRI scan of the lumbar spine and cervical spine was negative. (*Id.*). Dr. Spychalski opined that "based on the patient's work-up and her symptoms, I do not think she has an issue which is likely to respond with surgical intervention." (R. 451). He recommended that claimant "see a physiatrist[2] and

[2]Physiatrists, or rehabilitation physicians, are medical doctors who are experts at diagnosing and treating pain.

have a good concentrated rehabilitation program" to get her pain symptoms under control. (*Id.*). Finally, Dr. Spychalski observed that "the inciting event that seems to set off her pain symptoms does not seem to be particularly significant or forceful," and therefore he was "a little bit puzzled as to why she should continue to have such significant pain." (R. 451).

On December 10, 2002, claimant underwent a lumbar 5 radiological x-ray exam and MRI at Silver Cross Medical Center ("Silver Cross"). (R. 453-55). According to Dr. Harry R. Platt ("Dr. Platt"), it was a "normal MRI of the cervical spine and brain." (R. 455). With regard to the x-ray exam, Dr. Platt observed "minimal wedging of L2 unchanged since 7/16/02," intact disc spaces, and osseous structures within normal limits except for "suggestion of osteophenia." (R. 453). He also noted an "old compression fracture of L2 . . . minimal with very minimal wedging at L2." (*Id.*).

Dr. George B. Verghese ("Dr. Verghese"), a physician at Orthopedic Associates of Kankakee, completed an Employee's Work Status Report on February 13, 2003. (R. 461). Dr. Verghese diagnosed claimant with a stress fracture at L2. (*Id.*). He opined that claimant could perform "regular work" without limitations as of February 13, 2003. (*Id.*).

Claimant saw Dr. Brian A. Couri ("Dr. Couri"), a neurosurgeon at the Chicago Institute of Neurosurgery and Neuroresearch ("CINN"), on March 6, 2003. (R. 463-69). At that time, Britton-Dillon's medications included Bextra, Benadryl, Tylenol and Zoloft. (R. 464). Dr. Couri's examination revealed that claimant's lumbar and cervical range of motion was "okay." (R. 465). He noted that extension of the lumbar spine "tends to give her some low back pain." (*Id.*). Dr. Couri diagnosed claimant with cervical

radiculitis at C6, lumbar radiculopathy at L5, left shoulder pain, and a compression fracture at L2. (R. 466). In a letter to Dr. Fletcher, Dr. Couri stated that he could not determine the age of the compression fracture or if it was the cause of claimant's low back symptoms. (R. 465). However, Dr. Couri observed that the compression fracture did not "appear to be the primary cause of her symptoms." (*Id.*).

On March 27, 2003, claimant visited Dr. V. Paul Bertrand ("Dr. Bertrand"), a neurologist, for a scheduled Electromyography ("EMG") of her upper and lower extremities. (R. 537). Britton-Dillon complained of neck and arm pain, and reported numbness down her left arm after receiving electrical stimulation therapy. (*Id.*). Dr. Bertrand reviewed claimant's medical history and conducted an examination that revealed a supple neck, intact cranial nerves and normal motor strength in the upper and lower extremities. (*Id.*). Because it was a "normal" neurological examination, Dr. Bertrand concluded that there was "no abnormality where an EMG might be helpful." (*Id.*). He further stated that if claimant "persists with sensory findings, perhaps [further testing] may show some abnormality, although I doubt it." (*Id.*).

Britton-Dillon had a follow-up appointment with Dr. Couri on April 10, 2003. (R. 474-78). Dr. Couri noted that claimant has been "undergoing lumbar stabilization exercises in physical therapy . . . [and] cervical traction which has been helping her arm symptoms." (R. 474). Upon examination, the doctor observed that claimant's muscle strength was 5/5, except for her left arm external rotation which was 4+/5. (R. 474, 476). Dr. Couri diagnosed claimant with bilateral cervical pain, left shoulder pain, and a compression fracture at L2. (R. 476). In a letter to Dr. Fletcher, Dr. Couri noted that Spurling's and reverse neural tension tests were negative, and that an MRI of the

9

cervical spine showed no significant abnormality and was "essentially normal." (R. 474). Dr. Couri opined that claimant's compression fracture at L2 appeared to be old, and he did not believe it contributed to any significant symptoms. (*Id.*). He informed claimant that she needed to have an MRI of her lumbar spine before he could proceed with "specific treatment for that area of her back." (R. 475).

On April 25, 2003, claimant had an MRI of her lumbar spine at Silver Cross. (R. 330-31). The reviewing radiologist found "mild L2 vertebral body wedging and Schmorl's nodes with a scant amount of degenerative changes." (R. 330). The radiologist also noted "some spurring off the inferior endplate of L2 at L2/L3" which "may have been traumatic." (*Id.*).

Claimant returned to Dr. Couri for further treatment on April 30, 2003. (R. 481-85). In another letter to Dr. Fletcher reviewing that appointment, Dr. Couri relayed that claimant "states that her neck is no better but her left arm is 90% better." (R. 481-82). He observed that an MRI of claimant's lumbar spine showed a "questionably slight bulge at L5-S1," and wondered "how much of her symptoms [were] related to an annular tear of her lumbar spine." (*Id.*). Dr. Couri noted that Britton-Dillon "agreed to [proceed] with the left C6 transforaminal epidural steroid injection." (*Id.*). Dr. Couri recommended that claimant continue PT for her low back and try swimming "as this would be a good exercise for her back, neck and shoulders." (*Id.*). Finally, Dr. Couri proposed weaning claimant off Neurontin. (*Id.*).

On May 27, 2003, claimant received a left C6 transforaminal epidural steroid injection from Dr. Couri. (R. 541-44). After that injection, claimant stated that "she had no more pain in her left arm, the pain in her left arm had resolved." (R. 543). However,

during a follow-up examination on July 14, 2003, Dr. Couri indicated that the epidural steroid injection "did not significantly help the patient." (R. 494-98). At that time, claimant reported that she had not returned to physical therapy and is "back on Vicodin due to neck pain." (R. 496). In addition to the Vicodin, claimant's medication regime included Neurontin, Zanaflex, Ambien, Bextra, Benadryl and Tylenol. (*Id.*). Upon examination, Dr. Couri found "Hoffman signs bilaterally" that do not change with head movement and "symptoms of pain in the left S1 dermatomal distribution." (R. 494). The doctor assessed cervical pain of an "undetermined etiology," an old compression fracture at L2 "which is insignificant," and left S1 radiculitis. (*Id.*). Dr. Couri recommended  physical therapy focusing on the lumbar spine, a left S1 transforaminal epidural steroid injection, and a psychological evaluation to "help with all of her multiple stressors." (R. 494-95). Finally, Dr. Couri increased claimant's Neurontin and decreased her Zanaflex. (R. 495).

On July 21, 2003, claimant called Dr. Couri's office and reported that she was "sitting a lot" and "getting worse." (R. 499). Six days later, on July 27, 2003, claimant arrived at Silver Cross ER complaining of pain in her lower back for the past three days. (R. 548-49). An ER physician diagnosed claimant with chronic back and neck pain, discharged her in stable condition and ordered a follow-up appointment with Dr. Couri for the following day. (R. 549).

On August 7, 2003, Dr. Couri noted that he had performed a left S1 transforaminal epidural steroid injection on July 29, 2003. (R. 502). He also noted that claimant had not had "any more tingling in her leg" which "was constant prior to the injection," and that "her left arm was better since the injection as well." (*Id.*). Dr. Couri

recommended another steroid injection, replaced claimant's Vicodin with Darvocet, and continued her PT. (*Id.*). Claimant returned for treatment on October 1, 2003, and reported that she did not have the steroid injection because she took antibiotics for an unrelated infection. (R. 506-07). She also reported bilateral leg pain. (R. 506).

On November 14, 2003, Dr. J.F. Zamora ("Dr. Zamora") examined claimant on behalf of the Illinois Bureau of Disability Determination Services ("DDS"). (R. 176-82). Dr. Zamora noted that a medical history "was obtained from the claimant and medical records provided by [DDS] and is evaluated as being reliable." (R. 176). At that time, Britton-Dillon's primary complaints were "pain[] in neck, shoulder, and tingling on left side." (*Id.*). She weighed 117 pounds and did not smoke or drink. (R. 177). Claimant's medications included Bextra, Prozac, Darvocet, Ambien, and Soma. (*Id.*). Upon examination, Dr. Zamora found "tenderness to palpation along cervical spine and left shoulder," and "numbness of the external aspects of both legs." (R. 178). He found "no limitation of motion of any joint" in claimant's upper extremities and "normal sensation to pin-prick over body." (*Id.*). He concluded that claimant had full "range of motion values" in her cervical spine, lumbar spine, and shoulder. (R. 180-81). Dr. Zamora indicated that claimant had no difficulty in performing the following activities: getting on/off the table, tandem walking, walking on toes, walking on heels, squatting and arising, and hopping on one leg. (R. 179). Dr. Zamora concluded that claimant suffered from "muscular sprain lumbosacral area and neck, early arthritis sacro-iliac area, and possible disc disease cervical spine." (*Id.*).

Attached to Dr. Zamora's assessment is a lumber spine x-ray report from Dr. Sasan Payvar ("Dr. Payvar"), a radiologist at Glenwood Medical Imaging. (R. 182). Dr.

Payvar found "minimal end plate degenerative changes seen in the lower thoracic spine with also minimal degenerative changes in the lumbar spine." (*Id.*). The radiologist observed a mild anterior compression deformity of L2, but found it "difficult to determine" whether it was "acute or chronic in nature." (*Id.*).

The record also includes a Residual Functional Capacity ("RFC") assessment performed by Dr. Francis Vincent ("Dr. Vincent") and Dr. Gregory Carlock ("Dr. Carlock"), both DDS examining physicians, on November 21, 2003. (R. 20, 183-90). Both doctors signed the RFC assessment, and it is not clear which portion(s) each doctor completed. (R. 189). The doctors opined that claimant could "occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and push and/or pull unlimited, other than as shown for lift and/or carry." (R. 184). Dr. Carlock and/or Dr. Vincent also found that claimant had no postural, manipulative, visual, communicative, or environmental limitations. (R. 185-87). On June 22, 2004, and following claimant's request for reconsideration, Dr. Susan Haller and Dr. Frank Norberg affirmed the RFC Assessment. (R. 21, 189).

On January 18, 2004, claimant arrived at Provena Saint Joseph Medical Center via ambulance following a car accident. (R. 560-68). Claimant denied hitting her head in the accident, and reported neck and low back pain. (R. 565). Britton-Dillon also reported a "long history of neck and back pain," and that "it seems like the pain has not changed in location or intensity since the accident." (*Id.*). Dr. Andrew Zwolski ("Dr. Zwolski"), an ER physician, diagnosed claimant with a neck and back strain. (R. 566). He treated claimant with Darvocet and observed that her symptoms were subsequently

"somewhat relieved." (*Id.*). X-rays taken on that date showed "no acute fracture or dislocation" of claimant's lumbar and cervical spine. (R. 567-68).

Britton-Dillon saw Dr. Emil Cheng ("Dr. Cheng"), a physician at CINN, on January 26, 2004. (R. 571-75). According to Dr. Cheng, claimant "has begun to find overall improvement with her overall symptomatology." (R. 571). She reported "not having very much low back and leg pain at all," but "some neck and upper back pain and soreness." (*Id.*). After examining claimant, Dr. Cheng diagnosed myofascial pain of the neck and shoulders as well as a "possible" annular tear at L5-S1. (R. 571-72). The doctor also noted that claimant's "symptoms in her legs are now resolved." (R. 572). Dr. Cheng did not recommend surgery. (R. 573). He advised claimant to "try going back to work as she can tolerate." (R. 572). The doctor further recommended that claimant "avoid lifting significantly heavy objects or patients" and "perform position changes frequently." (*Id.*). Dr. Chen described claimant's plan to return to work at a physician's private office for one and a half days a week as "a good idea," and noted that claimant "can increase as tolerated from there." (*Id.*). Finally, Dr. Chen recommended that claimant continue taking Darvocet as needed. (*Id.*).

On Dr. Fletcher's order, claimant underwent a bone density examination at Silver Cross on February 2, 2004. (R. 577-79). After reviewing the results, Dr. Harry R. Platt ("Dr. Platt") concluded that claimant suffered from "severe osteoporosis." (R. 578). Dr. Platt noted "no significant change in the spine since 1/09/2003, although significant improvement is observed in the left hip since the previous study of 1/09/2003." (*Id.*).

K. Cozzolino ("OT Cozzolino") completed a modified functional capacity evaluation of claimant on February 5, 2004. (R. 581-82). OT Cozzolino noted that

claimant, who was forty years old at the time and had not worked since July 12, 2002, had been "sent here to Silver Cross Hospital to determine what work-related tasks [she] can perform for her previous job as an R.N." (R. 581). During the evaluation, claimant rated her pain "at worst a 10, at best fluctuates, and right now saying that she was able to tolerate her pain level 6 of 10." (*Id.*). She also reported the following limitations: sitting tolerance of approximately 30 minutes, static and dynamic standing tolerance of one hour, walking for 20 minutes, and lifting 10 pounds from floor to waist. (*Id.*). Britton-Dillon stated that sensation to both upper and lower extremities was "normal." (*Id.*). OT Cozzolino opined that claimant's active range of motion for both upper and lower extremities were within normal limits. (*Id.*).

Claimant returned to Silver Cross for continued evaluation "without any weight restrictions" on February 24, 2004. (R. 583). OT Cozzolino found claimant's maximum tolerance for floor to over-head lifts and floor to shoulder lifts was six pounds, while her maximum tolerance for waist to shoulder lift was nine pounds. (*Id.*). OT Cozzolino noted that Britton-Dillon complained of pain during the lifting test and, at its completion, rated her overall pain level at 8/10. (*Id.*). Due to the "limitations of this evaluation being performed in a clinic, and without having a job description," OT Cozzolino was "unable to determine if the patient can return to work." (*Id.*).

On March 11, 2004, claimant returned to Dr. Couri. (R. 272-73). After reviewing the modified functional capacity evaluation, Dr. Couri noted that "it appears that [claimant] was fairly limited, but . . . she stated that she can sit for long periods of time and she does okay as long as she uses her McKenzie roll, which will help to alleviate her back symptoms." (R. 272). Dr. Couri observed that Britton-Dillon had lost a

15

"significant amount of weight," but stated she had "done this on purpose." (*Id*.). After examining claimant, Dr. Couri concluded that her "low back pain is due to an annular tear at L5-S1 that tends to give her left S1 radiculitis." (R. 273). He also noted that claimant responded well to the left S1 transforaminal epidural steroid injections, which further confirmed his diagnosis. (*Id*.). Dr. Couri opined that claimant's annular tear was "under reasonable control now, and therefore, it is not a major symptom of hers." (*Id*.). In regards to the neck and shoulder pain, Dr. Couri indicated that this could be "more easily defined as a left rotator cuff problem." (*Id*.). He recommended that claimant "get an x-ray of her left shoulder, get an MR[I] anthrogram of her left shoulder, and . . . see Dr. Giridhar Burra . . . to have a complete work-up of her left shoulder and rotator cuff." (*Id*.).

Dr. Couri concluded that claimant could "return to work lifting no more than 5 to 10 pounds, changing positions every 40 to 60 minutes with rare bending, twisting, and turning." (R. 273). He opined that claimant "should not apply for full disability because there are jobs that she should be able to do as a nurse within the current limits" and "she can do more" within the anticipated advanced limits. (*Id*.). Dr. Couri instructed claimant to "pay close attention to how much she is lifting and carrying at home . . . and time how long she can sit for . . . walk for, and how long she can stand in a line." (*Id*.). The doctor explained that this information would "give [him] a better idea of how to assess her for return to work, and [he] will adjust her return to work status as needed." (*Id*.).

On March 22, 2004, OT Cozzolino completed a "list of activities . . . claimant was able to tolerate." (R. 584). OT Cozzolino found that claimant could tolerate ten minutes

of sitting before requiring a rest break, lift six pounds frequently, carry six pounds fifty feet, and tolerate walking 400 feet. (*Id.*). OT Cozzolino opined that, based on the aforementioned limitations, claimant "qualifies for the sedentary work level." (*Id.*). OT Cozzolino also noted that "[i]t has been discussed with Dr. Couri that [claimant] could tolerate a 4 hour work break with frequent position changes." (*Id.*).

On March 26, 2004, Dr. Cheng completed a work status form and restricted claimant to "modified duty." (R. 269). When asked to opine on claimant's activity restrictions, Dr. Cheng indicated "Low (Light/Sedentary)." (*Id.*). The doctor noted that claimant could occasionally lift five to ten pounds between the waist and shoulders, maintain a position for no more than forty to sixty minutes, and should avoid ladders and slippery, uneven surfaces. (*Id.*). Finally, Dr. Cheng opined that claimant should rarely bend, twist, or turn. (*Id.*). Dr. Cheng's records indicated that claimant called his office on April 27, 2004, "[w]ondering if shoulder pain and arm pain [are] work related" and his office instructed Britton-Dillon to "see Dr. Burra." (*Id.*).

Dr. Couri issued a work status form on July 30, 2004. (R. 528). When asked to opine on claimant's restrictions, Dr. Couri indicated "permanently disabled." (*Id.*). Claimant's medical records also include a letter from Dr. Couri dated September 25, 2005 and addressed "To Whom It May Concern." (R. 588-88A). In that letter, Dr. Couri states that he last treated claimant on July 13, 2004, at which time he ordered a transforaminal epidural steroid injection and repeat MRI of her lumbar spine. (R. 588). According to Dr. Couri, Britton-Dillon did not undergo the MRI because "she no longer had any medical insurance or any money at all," and was "unable to proceed with any medical care at that time." (*Id.*).

17

Dr. Couri recalled that claimant suffered a work-related injury on July 12, 2002 and subsequently developed neck pain, left arm pain, and low back pain.  (R. 588).  After her injury, claimant was diagnosed with a compression fracture at L2.  (*Id.*).  Dr. Couri opined that the compression fracture does not have "anything to do with her work-related injury."  (*Id.*).  As of July 13, 2004, Dr. Couri "felt that [claimant's] low back pain and left leg pain were both discogenically mediated from an annual tear at L5-S1 causing the low back pain and a radiculitis of the left S1 spinal nerve."  (*Id.*).  The doctor opined that claimant "did well" with a left S1 transforaminal epidural steroid injection, and that he planned to repeat that procedure.  (*Id.*).  Dr. Couri noted that Britton-Dillon did not respond to a left C6 transforaminal epidural injection and had not responded to physical therapy in this area.  (*Id.*).  He relayed his belief that "most of [claimant's] neck pain and arm pain was related to cervical zygapophyseal joint/facet syndrome."  (*Id.*).

Dr. Couri noted that claimant's employment prior to July 13, 2004 required "mostly sitting" for twenty-two hours per week.  (R. 588).  The doctor "had taken [Britton-Dillon] off work because the work had exacerbated her symptoms," and "[a]t that time she was unable to work her light duty job.  (*Id.*).  However, Dr. Couri recognized that claimant "has not been reevaluated since over 1 year ago to further assess her functional condition – whether her condition is better, worse, or about the same as what it was the last time I evaluated her and took her off of work."  (R. 588A).

Claimant visited Dr. Fletcher on September 14, 2005.  (R. 593).  At that time, Britton-Dillon's medication included Fosmax once a week, Tradezone, and Darvocet.  (*Id.*).  Claimant reported insomnia, osteopenia, and chronic pain.  (R. 593).  In addition to refilling claimant's medication, Dr. Fletcher prescribed a transcutaneous electrical

nerve stimulation ("TENS") unit for lower back pain.  (*Id.*).

### C.    Claimant's Testimony

Britton-Dillon testified at the November 23, 2005 hearing before ALJ Armstrong. (R. 608-25).  At the time of the hearing, claimant lived with her seventeen-year-old daughter in a townhouse.  (R. 618).  Britton-Dillon testified that she drives occasionally, "tr[ies] to cook a couple of times a week," and sometimes shops with the help of her daughter.  (R. 619).  Claimant "tr[ies] to pick things up" around the house.  (R. 620). She stated that her mom had been "coming and doing most of the housework, [but] she broke her hip a month ago."  (*Id.*).  Britton-Dillon spends most of her day watching television, lying on her bed, and playing with her dog.  (R. 622).  She wears a TENS unit every day and switches it between her lower back and shoulder.  (*Id.*).

Claimant injured herself on July 12, 2002 while lifting a patient, which is "stuff that a nurse really doesn't always do."  (R. 613).  According to claimant, her first set of doctors diagnosed "a fracture" and proceeded to treat that injury.  (R. 614).  Those doctors believed that the pain in her neck, left shoulder, and left leg was "referred pain from this fracture."  (R. 615).  Britton-Dillon testified that the doctors told her the injury was "inoperable," but that "they've done trigger point injections, and epidural injections, and a slew of physical therapy, and lots of medications."  (R. 614).

Britton-Dillon has a pending workers' compensation case.  (R. 614).  She stated that "[w]orkmen's comp cut me off and I had other insurance with my husband . . . so I changed doctors."  (*Id.*).  Britton-Dillon testified that her new doctor, Dr. Couri, said that "this fracture" was not causing her pain symptoms.  (R. 615).

At the time of the hearing, claimant worked as a medical assistant for her primary

19

care physician four hours a day, two days a week.  (R. 611).  This job required claimant to bring patients into the examining room, take their vitals, and write down their complaints.  (R. 612).  Claimant testified that she attempted to increase her hours, but she "can't go up without having to take time off . . . if I try to go more, then I have to take more medication, and then I'm too confused to do anything."  (R. 613).  According to claimant, her "doctor came up with this" part-time job after she completed "Vocational Rehab."  (R. 617).

Prior to working in Dr. Fletcher's office, claimant attempted to work at the Will County Health Department ("Will County") under the WIC program.  (R. 620).  She planned to work at Will County three days a week for seven and one half hours per day, but never made it out of training.  (R. 620-21).  Claimant testified that Will County was "very accommodating" and allowed her to get up from her computer throughout the day. (*Id.*).  Britton-Dillon stated that Dr. Couri recommended she quit working for Will County because her "muscle spasms were getting worse, and [her] neck was a mess."  (R. 621).  At that time, Dr. Couri referred claimant for "another run of physical therapy." (*Id.*).  Claimant stated that she was scheduled to "start therapy next week" and that "the last bit of therapy did a lot of good."  (*Id.*).

### D.    Medical Expert's Testimony

Dr. William Newman ("ME Newman") testified as the medical expert at the hearing.  (R. 623-27).  ME Newman did not see "objectively much of anything" in the records provided for his review.  (R. 623). The ME observed that "Dr. Couri talked about an annular tear, but that's not recorded on the MRI," and "an annular tear should be seen on an MRI."  (*Id.*).  ME Newman also observed that "the only facet joint disease

that's mentioned is the degenerative changes." (*Id.*). "They're vague about it, around L2 where she had a compression at one time . . . but a compression like that at L2 is a very minor thing . . . [and] disability from that shouldn't last for more than about three or four months." (R. 623-24). ME Newman further stated "that's a minor compression fracture and it shouldn't – even though it's fresh, the symptoms from that shouldn't last for more than two months." (R. 624). Claimant's attorney asked ME Newman if he reviewed Dr. Couri's medical records and his diagnosis of an annular tear at L5. (R. 625-26). ME Newman observed evidence of an L5-S1 annular tear in Dr. Couri's record, which he described as a "fairly serious" condition. (R. 627). Finally, ME Newman opined that claimant has "[n]o severe medical condition" and does not meet a "Listing." (R. 625).

### E. Vocational Expert's Testimony

Cherly Hoiseth ("VE Hoiseth") testified as the vocational expert at the hearing. (R. 627-31). VE Hoiseth testified in accordance with the information contained in the Dictionary of Occupational Titles ("DOT"). (R. 627). VE Hoiseth classified claimant's past employment as a waitress from July 1990 through September 1992 "at the low end of the semi-skilled continuum . . . and it's light work." (R. 628-29). In regards to claimant's past employment as a nurse, VE Hoiseth opined that claimant's description of lifting fifty pounds occasionally and twenty-five pounds frequently would meet the definition of DOT 075.364-0101. (R. 629). She stated that the DOT classifies this as "skilled work, SVP 7, at the medium exertional level." (*Id.*). VE Hoiseth also mentioned that working in a "rehab unit" would be "much heavier." (*Id.*).

ALJ Armstrong asked VE Hoiseth to consider a hypothetical individual with the

following limitations: light exertional duties, no repetitive overhead work with the left-hand non-dominant arm, and no work at unprotected heights or around dangerous moving machinery or open flames.  (R. 629.).  The VE concluded that this person could not perform claimant's past work as a nurse.  (*Id.*).  VE Hoiseth stated that a nurse, in general, requires frequent reaching.  (*Id.*).  She further explained that the DOT does not differentiate between reaching, but just says "reaching hands and arms in all directions." (*Id.*).  Accordingly, "from that point of view, [the VE] would have to rule out the nursing." (*Id.*).  VE Hoiseth observed that the job requirements of a waitress include "reaching frequently."  (*Id.*).

The ALJ asked VE Hoiseth to assume that, in addition to the aforementioned limitations, the hypothetical individual could perform "[n]o repetitive, but frequent reaching with the left non-dominant hand."  (R. 630).  When asked if the hypothetical individual could perform claimant's past work, VE Hoiseth stated that "at frequent it's doable."  (*Id.*).  ALJ Armstrong then asked if the hypothetical individual could perform claimant's past work as a waitress, and VE Hoiseth said "yes."  (*Id.*).

Next, ALJ Armstrong asked if the same hypothetical individual with an additional limitation of sedentary exertional duties would be able to perform claimant's past relevant work.  (R. 630).  VE Hoiseth concluded that the hypothetical individual would not be able to return to past relevant work.  (*Id.*).  She further opined that there would be no transferable skills from past semi-skilled or skilled work jobs within the hypothetical individual's residual functional capacity.  (*Id.*).  However, VE Hoiseth stated that the hypothetical individual could  perform work in the regional or national economy.  (*Id.*).  The VE testified that based on the metropolitan statistical area of Chicago, such a

person could perform the occupational duties of a receptionist (29,000 available jobs), general office clerk (16,000 available jobs), and information clerk (4,000 available jobs). (*Id.*).

The ALJ asked VE Hoiseth whether it would "knock [out] all or any other jobs in the regional or national economy" if the same hypothetical individual "for a multitude of reasons" would be unable to work more than four hours a day. (R. 631). VE Hoiseth testified that it would. (*Id.*). She further opined that it would "knock [out] all those jobs or any other jobs" if the same individual could work all day, but because of "periodic exacerbations caused by pain and side effect from medication, good and bad days, that person would miss more than two days out of every month." (*Id.*). Finally, the VE testified that if the same individual would lose or be unable to maintain concentration on a simple routine job for fifteen minutes out of an hour, those jobs would also be eliminated. (*Id.*).

## II.    LEGAL STANDARD

### A.    Standard of Review

This Court must uphold the ALJ's decision if it is supported by substantial evidence and is free from legal error. 43 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 2005) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). We must conduct a "critical review of the evidence" and consider the entire administrative record, but will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgement for that of the

Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (quoting *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). The ALJ's decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Id.* While the ALJ "must build an accurate and logical bridge from the evidence to his conclusion," he need not discuss every piece of evidence in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Rather, the ALJ must "sufficiently articulate [his] assessment of the evidence to assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curium) (quoting *Stephens v. Heckler*, 766, F.2d 284, 287 (7th Cir. 1985)).

**B.     Analysis Under the Social Security Act**

In order to receive disability insurance benefits, a claimant must be "disabled." A person is disabled under the Act if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). To determine if a person is disabled, an ALJ must consider: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considered conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether she can perform her past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon*, 270 F.3d at 1176. The claimant has the burden of establishing a disability at steps one through

24

four.  *Zurawski*, 245 F.3d at 885-86.  If the claimant reaches step five, the burden shifts to the Commissioner to show that the "claimant is capable of performing work in the national economy."  *Id.*

ALJ Armstrong followed this five-step analysis.  At step one, the ALJ found that claimant had not engaged in any substantial gainful activity after the alleged onset date.  (R. 13).  ALJ Armstrong then found, at step two, that claimant's arthritis in her left shoulder and degenerative disc disease were severe impairments.  (R. 14).  At step three, ALJ Armstrong determined that claimant's impairments did not meet or medically equal any of the impairments listed in 20 C.F.R. §404 (the "Listing").  (*Id.*).  Next, the ALJ found that claimant retained the RFC for "light work with no repetitive but frequent overhead work with left (non-dominant) arm and no work at unprotected heights or around dangerous machinery, open flames, or bodies of water."  (R. 15).  The ALJ also determined that claimant's allegations and subjective complaints were not fully credible.  (*Id.*).  At step four, ALJ Armstrong found claimant could return to her past relevant work as a waitress.  (R. 16).  He also determined, at step five, that claimant could perform other jobs in the national economy.  (*Id.*).  Therefore, ALJ Armstrong concluded that claimant was "not disabled" under the Act.  (R. 16-17).

Britton-Dillon contends that ALJ Armstrong erred in his determination.  First, claimant argues that the ALJ erred at step two because he ignored medical evidence that she suffered from other "severe" impairments.  Britton-Dillon further contends that the ALJ did not consider certain medical evidence that established a Listing-level impairment.  Next, claimant argues that the ALJ did not specify the reasoning behind his credibility determination and did not conduct a function-by-function assessment of her

ability to perform work related activities.  Finally, claimant argues that the ALJ erred at

steps four and five by ignoring a contradiction between his RFC determination and VE

Hoiseth's testimony.  We begin with claimant's contention that ALJ Armstrong

overlooked evidence of additional "severe" impairments.

## III.    DISCUSSION

### A.    The ALJ Did Not Err in His Step Two Determination

Under the regulations, an ALJ must determine if "any impairment or combination

of impairments . . . significantly limits [claimant's] physical or mental ability to do basic

work activities."  20 C.F.R. § 404.1520(c).   Here, ALJ Armstrong found that Britton-

Dillon suffered from severe impairments of arthritis in her left shoulder and degenerative

disc disease.  (R. 14).  Claimant contends that this finding is erroneous because "the

record does not disclose that the claimant had arthritis in her left shoulder but neck and

shoulder pain resulting from a rotator cuff impingement syndrome."  However, as ALJ

Armstrong recognized, Dr. Zamora diagnosed claimant with a "muscular sprain of

lumbosacral area and neck, early arthritis of sacro-iliac area, and possible cervical spine

disc disease."  (R. 14).  Accordingly, the ALJ's finding of severe arthritis is consistent

with the medical evidence.

Claimant also argues that the ALJ erred by ignoring additional conditions that she

characterizes as severe impairments. However, the second step of the sequential

analysis is a threshold determination.  *Maggard v. Apfel*, 167 F.3d 376, 378 (7th Cir.

1999).  Thus, once ALJ Armstrong determined that claimant met her burden at step two,

there was no reason for him to consider any additional severe impairments.  *See id.*;

*Zurawski*, 245 F.3d at 885 (recognizing that an affirmative answer at step two in the

sequential analysis leads to step three).  Accordingly, we will consider claimant's remaining arguments regarding the medical evidence in connection with our review of ALJ Armstrong's findings at step three.

**B.     ALJ Armstrong Failed to Adequately Explain the Weight Given to the Medical Opinions**

Next, claimant argues that ALJ Armstrong failed to consider all of the medical evidence, most notably the repeated references to an annual tear at L5 and evidence of a compression fracture at L2, fibromyalgia, and left arm radiculopathy.  *See Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) (remanding case where the ALJ overlooked several pieces of evidence and therefore did not provide a sufficient analysis of claimant's medical condition).  In fact, the ALJ did recognize claimant's diagnoses of an L5-S1 annual tear, a compression fracture at L2, fibromyalgia, and left arm radiculpathy. (R. 13-14).  Moreover, while Britton-Dillon contends that it "is further patent that the ALJ here failed to bring into consideration all medical evidence in the case record about [her] impairments," she does not cite any specific diagnosis or medical opinion that ALJ Armstrong failed to consider.  Even after the government pointed out this omission in its response to her motion, claimant still did not identify any specific evidence that the ALJ failed to consider, but stated only that his finding at step three "is belied by the medical record itself."  While this Court takes issue with claimant's failure to cite to specific medical records, we will nonetheless consider Britton-Dillon's arguments.

ALJ Armstrong summarized claimant's medical history in detail.  (R. 13-14).  He then found that claimant's impairments "do not cause restrictions rendering her unable to perform fine or gross movements or extreme limitations in walking."  (R. 15).  The

ALJ also concluded that claimant's "spinal disorders, as shown by radiographical evidence, do not result in nerve root compression, spine arachnoiditis, or lumbar spinal stenosis, which is required to meet or equal section 1.04." (*Id.*). Claimant argues that this conclusion is sufficiently erroneous as to mandate an order vacating the ALJ's decision and awarding Britton-Dillon benefits. We disagree. Rather, we find that remand is necessary because ALJ Armstrong did not sufficiently articulate the grounds for his conclusion so that this Court may "trace the path of his reasoning." *Diaz*, 55 F.3d at 307; *see also Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003) (holding that remand is appropriate where the ALJ failed to build a logical bridge between the evidence and her conclusions, "instead relying on conjecture and her own assessment of the medical evidence.").

This Court does not find that the ALJ's ultimate conclusion is erroneous as a matter of law. Rather, we remand because the ALJ did not build "an accurate and logical bridge from the evidence to his conclusion." *Dixon*, 270 F.3d at 1176. On remand, the ALJ should explain why he gave little weight to radiographical evidence that may favor claimant's application. This includes, without limitation, the signs of minimal wedging of L2 and spurring of the inferior endplate of L2 at L2/L3 evident in her April 25, 2003 MRI. The ALJ should also explain why he elected to discount claimant's diagnosis of an L5-S1 annual tear. Further, the ALJ should expressly state the weight assigned to the opinions of claimant's treating physicians and reference specific medical opinions that support his conclusions. *See, e.g. Scott v. Barnhart,* 297 F.3d 589, 596 (7th Cir. 2002) (remanding where ALJ did not conduct a "meaningful analysis" of the medical evidence)*; Clifford*, 227 F.3d at 870 (holding that the ALJ's failure to provide any

explanation for his belief that claimant's activities were inconsistent with the treating physician's opinions constitutes error).

### C.    The ALJ's Credibility Finding is Not Patently Wrong

Next, claimant contends that the ALJ erred in finding that her allegations and subjective complaints were not fully credible.  Because the ALJ is in superior position to assess the credibility of a witness, his credibility determination will only be reversed if it is "patently wrong."  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).  "It is only when the ALJ's determination lacks any explanation or support that we will declare it to be patently wrong, and deserving of reversal."  *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).

Britton-Dillon contends that reversal is warranted because ALJ Armstrong did not adhere to the requirements of Social Security Ruling ("S.S.R.") 96-7p.  That ruling requires an ALJ to do more than "make a single, conclusory statement" and "simply . . . recite the factors that are described in the regulations for evaluating symptoms." Rather, an ALJ must state "specific reasons for the finding on credibility, supported by the evidence in the case record" that is "sufficiently specific to make clear to the individual and any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  S.S.R. 96-7p (citations omitted); *see also Zurawski*, 245 F.3d at 887 (noting that an ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record.").

Here, ALJ Armstrong  determined that claimant's "allegations and subjective complaints are . . . not . . . fully credible when considered in light of the entirety of the

29

evidence of record." (R. 15). The ALJ cited a number of specific reasons for that determination, including that claimant was "treated conservatively" with pain medications since she suffered her injury on July 12, 2002 and never underwent surgery. (*Id.*). ALJ Armstrong also observed that claimant "refused pain clinic treatment," "refused further procedures to her neck despite chronic complaints of pain," and "refused psychiatric treatment." (*Id.*). Thus, the ALJ supported his credibility determination, at least in part, with claimant's medical records. *See Edwards v. Sullivan,* 985 F.2d 334, 338 (7th Cir. 1993) (recognizing that a reviewing court should not reconsider credibility determinations made by the ALJ as long as they find some support in the record). The ALJ also found that Britton-Dillon's subjective complaints were inconsistent with the medical evidence. (R. 15). A claimant's credibility can be lessened because of the "discrepancy between the minimal impairment expected from her conditions and her testimony of debilitating pain." *Powers*, 207 F.3d at 435. Finally, we note that claimant failed to identify medical evidence which contradicts ALJ Armstrong's conclusions. For each of these reasons, we cannot conclude that the ALJ's credibility determination was "patently wrong."

**D. This Court Cannot Determine if the ALJ Conducted a Function-by-Function Assessment in Connection with his RFC Determination**

Claimant argues that reversal is warranted because ALJ Armstrong's RFC finding is inconsistent with Dr. Couri's conclusion that she is "permanently disabled." However, "a claimant is not entitled to disability because her physician states that she is 'disabled' or unable to work." *Dixon*, 270 F.3d at 1177. ALJ Armstrong stated that he disregarded Dr. Couri's opinion that claimant was "permanently disabled" because such

a statement is not a "medical opinion, but [is] an administrative finding." (R. 16). "While the treating physician's opinion is important, it is not the final word on a claimant's disability." *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) (quoting *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996)). Thus, Dr. Couri's statement is not, in and of itself, sufficient to mandate reversal of the ALJ's RFC finding.

Claimant also argues the ALJ erred in his RFC determination because he did not undertake a function-by-function analysis of claimant's ability to perform work related activities as required by S.S.R. 96-8p. That ruling requires the ALJ to discuss an "individual's ability to perform sustained work activities in an ordinary work setting on a regular basis," and "describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." *Lewis v. Astrue*, 518 F.Supp.2d 1031, 1043 (N.D. Ill. 2007) (citations omitted); S.S.R. 96-8p. However, while the RFC assessment is a function-by-function assessment, "the expression of a claimant's RFC need not be articulated function-by-function; a narrative discussion of a claimant's symptoms and medical source opinions is sufficient." *Knox v. Astrue*, 2009 U.S. App. LEXIS 13493, *13 (7th Cir. June 19, 2009) (quoting S.S.R. 96-8p).

Here, ALJ Armstrong did not provide a detailed narrative discussion of claimant's limitations. Therefore, we cannot determine if the ALJ did, in fact, conduct a function-by-function assessment. On remand, the ALJ must provide a more detailed narrative discussion explaining his RFC determination, including any postural, lifting, and standing limitations related to claimant's impairments. *See Taylor v. Barnhart*, 425 F.3d

345, 352 (7th Cir. 2005) (holding "the ALJ did not explain how he arrived at these conclusions; this omission in itself is sufficient to warrant reversal of the ALJ's decision.").

**E.      The ALJ's Step Four and Step Five Analysis.**

Claimant also seeks remand on the grounds that the ALJ did not consider VE Hoiseth's testimony regarding the hypothetical individual. We need not reach this argument. Rather, we instruct the ALJ, on remand, to reconsider his findings at steps four and five after determining the appropriate limitations regarding Britton-Dillon's RFC.

**IV.      CONCLUSION**

For the reasons set forth above, Britton-Dillon's motion for summary judgment is granted in part and denied in part and the Commissioner's motion for summary judgment is denied. The case is remanded to the Social Security Administration for further proceedings consistent with this opinion. It is so ordered.

**ENTERED:**

_____

**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated: October 29, 2009**